UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 08-495-KSF

MW UNIVERSAL, INC.                                                     PLAINTIFF

v.                      **OPINION & ORDER**

G5 CAPITAL PARTNERS, LLC                                   DEFENDANT

\* \* \* \* \* \* \*

This matter is before the Court on the Motion for Summary Judgment filed by the Plaintiff, MW Universal, Inc. ("MW") against the Defendant, G5 Capital Partners, LLC ("G5"), pursuant to Rule 56 of the Federal Rules of Civil Procedure [DE #52]. G5 has failed to respond to Plaintiff's Motion and the time for doing so has expired. Accordingly, this matter is ripe for review.

I.     FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a consulting services contract entered into on or about March 15, 2007 between MW and G5, pursuant to which G5 agreed to render its best efforts in order to obtain financing or capital to provide working capital for MW and/or financing for expansion, mergers or acquisitions, or interim "bridge" financing for MW (the "Contract"). Specifically, the Contract states that G5 will provide the following specific advisory and consulting services:

> G5 staff will make themselves available on an as needed basis for strategic planning, general brainstorming, conferences and meetings, fund raising, negotiations, transaction structuring, legal documentation oversight, and closing.
>
> G5 will on a "best efforts" basis pursue fund raising sources for [MW] including but not limited to U.S. and International Hedge Funds, Private Equity Sources, Commercial Banks, Corporate Investors, and High Net Worth Individuals. G5 will document and provide introduction to funding sources and provide [MW] with

1

> weekly progress reports as to the fund raise timing and approval. G5 will identify interested funding sources and assist in negotiating funding terms, conditions, and amounts up to $45,000,000 in Preferred Stock or Subordinated Debt (with Warrants). Final agreed upon amounts, rates, terms, and conditions shall be subject to the approval of [MW]. Fund raising will be for the following purposes:
>
>> To raise $40.0 million in funds for acquisition of assets or equity interests of metals manufacturing companies and facilities.
>>
>> To raise $5.0 million in funds for general working capital, closing costs, and agency fees.
>
> G5 will maintain periodic contact with MW's representatives to ensure open and clear understanding of issues relating to fund raising including, timing, pricing, legal terms and conditions, and business impacts. If further services are warranted an amendment or extension will be negotiated.

[DE #52-2].

According to MW, the intention of the Contract was for G5 to obtain financing for MW's acquisition of WF Acquisition, Inc. ("Western Forge"), which was to be acquired by MW's subsidiary, W Forge Holdings, Inc. ("W Forge"), as well as for financing to be used as a source of funds for working capital for the business after closing. Per its terms, the Contract had a term of 120-days from the signing of the Contract, although the term of the Contract could be extended for successive periods on terms to be mutually agreed to by both parties pursuant to a written agreement.

MW also asserts that the parties understood that time was of the essence under the Contract. According to MW, this requirement was understood because closing the purchase of Western Forge by June 30, 2007 would result in a much lower purchase price, due to the working capital adjustment (the "Working Capital Adjustment") that was built into the stock purchase agreement (the "SPA") between W Forge as purchaser and Western Forge as seller. Under the SPA, the purchase price would increase dramatically if the closing were to occur at a later time. MW asserts that G5 was aware of both the substantial discount on the purchase price that MW would obtain if the transaction

2

could be closed by June 30, 2007, due to the Working Capital Adjustment provision of the SPA (which, according to MW, was the reason that the termination date for the Contract was set at 120 days from the signing of the Contract) and the cyclical nature of Western Forge's business, which traditionally resulted in Western Forge's working capital levels being at their lowest around June 30 of each year. According to MW, G5 repeatedly told MW that it would provide the funding by July 13, 2007, the expiration date of the Contract, but such funding was never received. MW alleges that MW and Western Forge were ready, willing and able to consummate the sale transaction, but for the funding that G5 was supposed to provide.

In addition, despite the Contract's requirement that G5 was to keep MW periodically informed regarding fundraising, MW alleges that G5 failed to regularly update MW regarding any fundraising issues. MW further alleges that the updates that G5 did provide often included misrepresentations and falsehoods. Even after the expiration of the Contract, MW alleges that G5 continued to make false representations to MW orally and via email that it was wiring funds to MW that could be used for MW's purchase of Western Forge. According to MW, these misrepresentations continued to delay the closing of MW's purchase of Western Forge.

MW alleges that G5's failure to produce the necessary funding did, in fact, result in a large increase in the purchase price, as the working capital of Western Forge increased significantly from the time that G5 first promised funding of the purchase until the time that MW was actually able to fund the purchase through alternative means. MW states that the delay caused by G5's misrepresentations and failures to comply with the Contract caused it to incur at least $6,900,000.00 in damages, attributable to this increase of working capital.

MW filed its Complaint in this Court on December 4, 2008, bringing claims of negligent and fraudulent misrepresentations and, in the alternative, breach of the Contract. Specifically, MW

alleges that, despite G5's repeated representations that it would raise the necessary funds on time, as well as its later representations that it actually had raised the necessary funds and that such funds were being sent via wire transfer to MW, G5 never raised or provided any funds to MW in connection with the purchase of Western Forge. As a result, MW was unable to consummate the purchase of Western Forge in a timely fashion, causing MW, through its subsidiary, to eventually pay a significantly higher price for Western Forge. MW also alleges that G5 breached the Contract by: (1) failing to use its best efforts to secure financing during the 120-day term of the Contract; (2) failing to ensure an open and clear understanding of the issues related to the timing of the fundraising; and (3) failing to meet its promised deadlines, even though time was of the essence.

## II.   LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that

4

"there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

This case is somewhat unique in that G5 has not filed a response to MW's motion. In addition, although G5 filed an Answer and was initially represented by counsel, G5's counsel withdrew on March 3, 2009 and G5 has since failed to obtain counsel despite multiple Court orders to do so. Since August 2009, G5 has failed to respond to any pleadings or orders that have been filed in this case. Thus, the Court can only presume that G5 is no longer actively asserting a defense in this action.

Local Rule 7.1(c) specifically warns parties that the "[f]ailure to timely respond to a motion may be grounds for granting the motion." LR 7.1(c). In addition, under Fed. R. Civ. Pro. 56(e),

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. Pro. 56(e). Here, G5 is not currently represented by counsel of record, in defiance of this Court's orders, and has had ample opportunity to respond to other pleadings and orders and has

5

failed to do so. Thus, the Court does not see any reason to delay this matter further under Rule 56(e)(1) to provide G5 any further opportunity to address any assertions of fact made by MW in its motion, as there is no reason to believe that G5 would take advantage of such an opportunity. Rather, in these circumstances, the Court finds that it is appropriate to consider the factual assertions made by MW in its motion for summary judgment as undisputed and will grant summary judgment in MW's favor if MW's motion and supporting materials show that MW is so entitled.

### III. ANALYSIS

#### A. Applicable Law

Because this case arises under diversity jurisdiction, the Court applies Kentucky law, including Kentucky's choice-of-law principles. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). Kentucky applies different choice-of-law rules depending on whether the claim involves a contract or a tort. In contract cases, Kentucky law requires the Court to determine "which state has the most significant relationship to the transaction and the parties." *Lewis v. American Family Ins. Group*, 555 S.W.2d 579, 581-82 (Ky. 1977)(citing Restatement (Second) of Conflict of Laws § 188 (1971)); *Poore v. Nationwide Mut. Ins. Co.*, 208 S.W.3d 269, 271 (Ky. Ct. App. 2006). In tort cases, Kentucky does not apply the most significant relationship test. "The conflicts question should not be determined on the basis of a weighing of interests...but simply on the basis of whether Kentucky has enough contacts to justify applying Kentucky law." *Adam v. J. B. Hunt Transport, Inc.*, 130 F.3d 219, 230 (6th Cir. 1997). *See also Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)("[I]f there are significant contacts – not necessarily the most significant contacts – with Kentucky, then Kentucky law should be applied").

MW's claims in this case sound in both contract and tort. Although MW does not directly address the choice-of-law issue, its motion analyzes its claims under Kentucky law. In its Complaint, MW alleges that G5's conduct and representations in this matter, as well as the damages suffered by MW, were directed to MW at its principal place of business in Paris, Kentucky [DE #1]. Thus, with respect to MW's tort claims, the Court finds that there are enough contacts with Kentucky to justify the application of Kentucky law. With respect to MW's contract claims, there is no choice-of-law provision in the Contract itself. However, in the absence of a choice-of-law provision, and any evidence or argument suggesting the application of another state's law, the Court will adopt MW's apparent contention that Kentucky law applies to MW's contract claims as the state with the most significant relationship to those claims.

B.     MW's Fraudulent Misrepresentation Claim

Under Kentucky law, in order to prevail on its fraudulent misrepresentation claim, MW must establish six elements:

> (1) that the declarant made a material misrepresentation to the plaintiff, (2) that this misrepresentation was false, (3) that the declarant knew it was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.
>
> *Wallace v. Midwest Financial & Mortg. Services, Inc.*, 728 F.Supp.2d 906, 923 (E.D.Ky. 2010)(quoting *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2007)). *See also United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

The party claiming harm has the burden of proving each element by clear and convincing evidence, although "[f]raud may be established by evidence which is wholly circumstantial." *Rickert*, 996 S.W.2d at 468 (citations omitted). As to reliance, MW must prove that its reliance on G5's misrepresentations was reasonable, and in making this determination, MW's knowledge and

7

experience should be considered. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1447 (6th Cir. 1993); *Vest v. Goode*, 209 S.W.2d 833, 836 (Ky. 1948). In addition, "[i]n Kentucky, a claimant may establish detrimental reliance in fraud action when he acts or fails to act due to fraudulent misrepresentations." *United Parcel Service v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999).

To be actionable, a misrepresentation must relate to a past or present material fact; a mere statement of opinion or prediction is insufficient. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). Thus, "forward-looking opinions about investment prospects or future sales performance...generally cannot be the basis for a fraud claim." *Id*. This is true even if these forward-looking recommendations and opinions are misguided, imprudent or overly optimistic. *Id*. (quoting *In re Salomon Analyst AT&T Litigation*, 350 F.Supp.2d 455, 467 (S.D.N.Y. 2004)).

Here, MW points to evidence that G5 repeatedly made representations to MW that funds were being wired to MW when, in fact, they were not and G5 knew they were not. Specifically, MW submits an August 30, 2011 affidavit signed by its Chairman, George Hofmeister, stating that on August 25, August 31 and September 10, 2007, John Grambling, Jr. of G5 represented to MW that MW could expect a wire transfer to facilitate the transaction, but none of the wire transfers were ever sent [DE #52-4]. MW also relies on emails purportedly sent by John Grambling to Steve Brown referencing these potential wire transfers [DE #52-6]. Specifically, a September 10, 2007 email states: "NO excuses, I have arranged it and looking for a landing time" [*Id.*]. Although no further context for this statement is provided, in the absence of proof to the contrary, the Court will accept MW's undisputed representation that this statement is intended to refer to a wire transfer to MW that never transpired. According to MW, G5's expected broker's fee that it would receive under the Contract if it were able to eventually locate funding for the transaction, a fee that it would not receive

if MW obtained the funds elsewhere, provided G5 with motivation to supply MW with false information and delay the closing of the purchase of Western Forge.

Based on the Hofmeister affidavit and these emails, the Court finds that MW has provided sufficient evidence that G5 made statements that went beyond mere opinions or predictions but were instead affirmative representations to MW that funds were being wired to G5 when, in fact, they were not. In addition, as the purpose of the Contract was for G5 to render its best efforts to secure financing for MW, G5's representations about this funding were certainly material. Moreover, as it is undisputed that no funds were ever wired, as evidenced by the Hofmeister affidavit, it appears that G5 made these false representations either knowingly or recklessly. It is also undisputed that, as stated in the Hofmeister affidavit, MW was induced not to seek alternative financing options for a period of time in reliance on G5's representations that the funding was being wired when, in reality, it was not. Finally, MW has submitted undisputed evidence[1] that the delay in its ability to close the Western Forge/W Forge transaction caused by G5's representations, as well as the alternative credit terms MW received once it pursued alternative financing, resulted in a dramatic increase in the amount that MW, through its subsidiary, eventually had to pay in the transaction, thus damaging MW in the amount of at least $6,900,000.00. Accordingly, MW has set forth evidence supporting each of the elements of its claim against G5 for fraudulent misrepresentation. As this evidence is undisputed, the Court finds that MW is entitled to summary judgment against G5 on its fraudulent misrepresentation claim.

---

[1] In addition to the Hofmeister affidavit, MW relies on the terms of the eventual Stock Purchase Agreement between Western Forge and W Forge Holdings, Inc., as well as a chart of Western Forge's Working Capital Balances on June 30, 2007, July 31, 2007 and September 24, 2007, which shows the roughly $8 million increase in Western Forge's working capital balance between July 31, 2007 and September 24, 2007.

C.   MW's Negligent Misrepresentation Claim

Under Kentucky law, the requirements of a claim for negligent misrepresentation are described as follows: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Presnell Construction Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d 575, 580 (Ky. 2004).  In addition, "[l]ike the cause of action for fraud, moreover, a negligent misrepresentation claim requires proof of an actionable misrepresentation, i.e. 'false information,' and 'allegations concerning...mere opinions and predictions cannot be deemed to meet that requirement.'" *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 473 (6th Cir. 2011)(quoting *Flegles, Inc.*, 289 S.W.3d at 553-54 (Ky. 2009)(alterations in *Ashland*).  Moreover, the Kentucky Supreme Court has held that "the tort of negligent representation defines an independent duty for which recovery in tort for economic loss is available." *Presnell*, 134 S.W.3d at 582.

The same evidence supporting MW's fraudulent misrepresentation claim also supports its claim for negligent misrepresentation.  As noted above, the undisputed evidence submitted by MW shows that: (1) G5, in the course of its business supplied false information (here, that the funds were being wired) for the guidance of MW in its business transaction; (2) MW justifiably relied on this information; and (3) MW's reliance caused it to suffer pecuniary loss.  Although the Court has found that G5's representations regarding the wire transfers were made either intentionally or recklessly, at the very least, MW has shown that these representations were made negligently.  For these reasons, even if MW were not entitled to summary judgment on its fraudulent misrepresentation

10

claim, the Court finds that it is entitled to summary judgment on its negligent misrepresentation claim.

>    D.    MW's Promissory-Estoppel Claim

In its motion, MW also asserts that it is entitled to judgment against G5 based on a promissory estoppel theory. Under Kentucky law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Ashland, Inc.*, 648 F.3d at 472 (quoting *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 11-12 (Ky. Ct. App. 1990)). Moreover, "[a]lthough some states also require that the promisee's reliance be reasonable, *see, e.g., Rigby v. Fallsway Equip. Co.*, 150 Ohio App.3d 155, 779 N.E.2d 1056, 1061 (2002), Kentucky law is unsettled on this issue, *see, e.g., TWB Distrib., LLC v. BBL, Inc.*, Civil Action No. 3:08–CV–509–5, 2009 WL 5103604, at *5–6 (W.D.Ky. Dec. 17, 2009)(collecting cases)." *Ashland, Inc.*, 648 F.3d at 472. Regardless, "the reasonableness of the promisee's reliance 'warrants significant consideration in deciding whether enforcement of a promise is necessary to avoid injustice.'" *Id*. (quoting *TWB Distrib.* at *6). "The standard of proof in a promissory estoppel claim is a preponderance of evidence." *Rickert*, 996 S.W.2d at 470.

Because the Court has found that MW is entitled to summary judgment on its fraudulent and negligent misrepresentation claims, it is unnecessary to also analyze MW's claims under a promissory estoppel theory. Regardless, the Court notes that the undisputed evidence submitted by MW shows that G5 made promises that the funding for the purchase of Western Forge was being wired; G5 should have reasonably expected its promises to cause MW to forgo seeking alternative financing for the transaction; and that MW did, in fact, forgo seeking alternative financing as a result

11

of those promises. Thus, even if MW were not successful on its fraudulent and negligent misrepresentation claims, it could recover damages from G5 under a promissory estoppel theory.

      E.      MW's Breach of Contract Claim

In the alternative to its tort claims against G5, MW has also asserted that G5 breached the Contract by: (1) failing to use its best efforts to secure financing during the 120-day term of the Contract; (2) failing to ensure an open and clear understanding of the issues related to the timing of the fundraising; and (3) failing to meet its promised deadlines, even though time was of the essence. To establish its breach of contract claim, Plaintiff must show: "(1) the existence of a contract, (2) breach of that contract, and (3) damages resulting from that breach." *Bloodstock Research Information Services, Inc. v. Edbain.com, LLC*, 622 F.Supp.2d 504, 515 (E.D.Ky. 2009)(citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 223 S.W.3d 723, 727 (Ky. App. 2007)).

Here, the existence of the Contract is undisputed. In addition, under the terms of the Contract, G5 was obligated to pursue fundraising sources for MW on a "best efforts" basis, document and provide introduction to funding sources, provide MW with weekly progress reports as to the fundraising timing and approval, and to maintain periodic contact with MW's representatives to ensure open and clear understanding of issues relating to fundraising [DE #52-2]. According to the Hofmeister affidavit, at the time the Contract was signed and continuing up to and until the expiration of the Contract on July 13, 2007, G5 repeatedly told MW that it would provide the funding by July 13, 2007, although such funding was never received. Hofmeister also states that G5 breached the Contract by failing to maintain periodic contact with MW regarding its fundraising efforts, specifically regarding the timing, pricing, legal terms and the business impact of any fundraising; failing to use its best efforts to secure financing; and failing to meet its promised

deadlines. As noted previously, because G5 has failed to respond to MW's motion, the Court considers this evidence to be undisputed.

However, an affidavit consisting of no more than unsupported allegations does not meet the standard established by Rule 56(e) and, accordingly, is insufficient to succeed on a motion for summary judgment. *Brown v. First Nationwide Mortgage Corp.*, 206 Fed.Appx. 436, 441, 2006 WL 3289232 (6th Cir., Nov. 9, 2006)(unpublished). Unfortunately for MW, Hofmeister's conclusory statement that G5 breached the Contract because it failed to use its "best efforts" to secure financing for MW is not particularly helpful to the Court, as it provides absolutely no insight into what efforts G5 made to secure financing. Notably, "best efforts" do not necessarily mean successful ones. Thus, it is possible that G5 did, in fact, use its "best efforts," even though it was unable to secure financing for MW. Without additional information regarding the efforts that were made by G5, it is impossible for the Court to evaluate whether G5 fulfilled its contractual obligation to use its "best efforts." In addition, although Hofmeister concludes that G5 breached the Contract by failing to meet its promised deadlines, there were no "deadlines" in the terms of the Contract. Although the short 120-day term of the Contract may give rise to a reasonable expectation that G5 would have performed at least some of its duties under the Contract before the Contract expired, there simply is not enough information provided that would permit the Court to find that G5's failure to meet a particular deadline was a breach of the Contract.

Despite these shortcomings, Hofmeister's affidavit is sufficient to establish that G5 breached its clear contractual duty to maintain periodic contact with MW regarding its fundraising efforts, specifically regarding the timing, pricing, legal terms and the business impact of any fundraising. According to Hofmeister, G5 failed to maintain this contact. As this evidence is undisputed, the Court finds that it is sufficient to show that G5 breached the Contract. In addition, as MW has

13

shown that G5's failure to maintain adequate contact with MW regarding the status of its fundraising efforts contributed to the delay in MW's ability to move forward with W Forge's purchase of Western Forge and that this delay resulting in a higher purchase price for Western Force when the sale eventually closed, MW has shown that it suffered damages as a result of G5's breach. Accordingly, in the alternative to MW's claims for fraudulent and negligent misrepresentation, MW is entitled to summary judgment on its breach of contract claim.

  F. <u>MW's Damages</u>

As the Court finds that MW is entitled to summary judgment on its fraudulent and negligent misrepresentation claim and, in the alternative, its breach of contract claim, the next issue is the amount of damages to which MW is entitled. With respect to MW's fraud-related claims (fraudulent misrepresentation and negligent misrepresentation), under Kentucky law, "[t]he measure of damages for fraud is, as a general rule, the actual pecuniary loss sustained." *Sanford Const. Co. v. S & H Contractors, Inc.*, 443 S.W.2d 227, 239 (Ky. 1969)(citations omitted). Thus, "the Kentucky rule for assessing damages is that the victim of the fraud is entitled to compensation for every injury which was the natural and proximate result of the fraud." *Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726, 735 (6th Cir. 1995)(citing *Sanders, Inc. v. Chesmotel Lodge, Inc.*, 300 S.W.2d 239, 241 (Ky. 1957)). *See also Gresh v. Waste Services of America, Inc.*, 738 F.Supp.2d 702, 715 (E.D.Ky. 2010).

With respect to MW's breach of contract claim, under Kentucky law generally, "the measure of damages for breach of contract is that sum which will put the injured party into the same position he would have been had the contract been performed." *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky. 1995)(quoting *Perkins Motors, Inc. v. Autotruck Federal Credit Union*, 607 S.W.2d 429, 430 (Ky. Ct. App. 1980)). Further, courts distinguish between general and special contract damages.

14

> [G]eneral damages, recoverable for a breach of contract, are such as may fairly and reasonably be considered as arising naturally – that is according to the usual course of things – from the breach of the contract itself or such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach of it . . . [S]pecial [damages] are such as arise where there are special circumstances attending the making of the contract and its observance would take it out of the natural and usual course of things. . . . In order to recover special damages the party sought to be charged must have had notice of such circumstances at the time the contract is made, and in such a way that he must know that the person with whom he is contracting reasonably believes that he is accepting the contract with the special condition.

*United States Bond & Mortgage Corp. v. Berry*, 61 S.W.2d 293, 297 (1933).

Here, MW argues that both G5's fraudulent/negligent misrepresentations concerning the timing of the funding for the purchase of Western Forge, as well as G5's breach of contract, caused the closing of the Western Forge purchase to be delayed, causing a significant increase in the purchase price. Specifically, MW has submitted evidence that the working capital of Western Forge increased significantly from the time that G5 first promised funding of the purchase until the time that MW was actually able to fund the purchase through alternative means. MW states that this increase of working capital caused it incurred at least $6,900,000.00 in damages via the increased purchase price as a result of G5's misrepresentations and failures to comply with the Contract. Thus, under both its fraud theories and its breach of contract theory, MW argues that it is entitled to judgment in the amount of $6,900,000.00.

As G5 has not responded to MW's motion, there is no evidence in the record contradicting MW's damages theory. Thus, MW's evidence regarding the damages it has incurred is undisputed. Accordingly, the Court finds that MW is entitled to judgment in the amount of $6,900,000.00.

For all of the foregoing reasons, the Court, being otherwise fully and sufficiently advised, **HEREBY ORDERS** as follows:

    (1)    Plaintiff's motion for summary judgment [DE #52] is **GRANTED**;

(2)   Defendant is liable to Plaintiff in the amount of $6,900,000.00;

(3)   judgment in favor of Plaintiff will be entered contemporaneously herewith;

(4)   this matter is **STRICKEN** from the active docket of this Court;

(5)   this is a final and appealable order; and

(4)   The Clerk of Court shall serve this Order upon Defendant, by certified mail, return receipt requested, at the following addresses:

G5 Capital Partners, LLC
641 Lexington Avenue
New York, NY 10022

G5 Capital Partners, LLC
c/o John Grambling, Jr.
P.O. Box 701
New York, NY 10150-0701

John Grambling, Jr.
273 Chestnut Hill Rd.
Stone Ridge, NY 12484

This February 21, 2012.



**Signed By:**

*Karl S. Forester* KSF

**United States Senior Judge**